Good morning. Counsel, before you begin, I just have one preliminary question. Has Rashika's mother been naturalized? No, she is here as a lawful permanent resident, but she was not naturalized. That was supposed to occur in 2006. Yes, she did not pass her interview. However, Ms. Rashika is current under her mother's LPR application. So, easy for the question that might make this case moot. But since she's not, can you proceed? So is she an LPR then, your client? No, my client is not. She's current, but these proceedings, I think, we looked into mediating with the Immigration Service, but our experience is that San Francisco doesn't normally mediate claims of this sort. Well, let me say this on mediation. I'm not going to ask the government to make a determination here without checking with her client. But we've had considerable success in recent times in cases like this where we don't have such a major legal stumbling block, but we have a relative, and the Ninth Circuit Mediation Office has been, at least according to parties, quite useful in mediating these. So I want to offer the services of mediation. What I think we'll ask you to do is that you can jointly advise the clerk within 20 days whether you wish to proceed with mediation. And we, of course, as the judges, won't know who wanted to or who didn't want to. If you say yes, then we assume you both did. And we will offer the services of the Ninth Circuit mediator. If we get back the word that for whatever reason mediation, you couldn't resolve it between yourselves as counsel or mediation isn't appropriate, then we'll go ahead and issue a decision. So you may proceed. Thank you. Jaspreet Kaur Singh on behalf of Petitioner Ruma Rishika, an applicant of asylum from Fiji. There are two primary issues of contention before this Court today. The first issue relates to Ms. Rishika's failure to file for asylum within a year of her entry into the United States, and that we believe the agency, we contend that the agency erred in determining that she did not qualify for the child exchange circumstances exception. The second issue relates to the substance of Ms. Rishika's case, namely that the agency's conclusion that Ms. Rishika does not have a well-founded fear of future persecution is not supported by substantial evidence. I'll first turn to the issue of the agency's application of the one-year deadline that resulted in barring Ms. Rishika from seeking asylum. As indicated in our 28-J letter, we agree with the government's position that this Court has jurisdiction to review this issue. Ms. Rishika applied for asylum on May 15, 2000, while the coup was unfolding in Fiji, after speaking with her brother in Fiji about the worsening conditions. Her application was pending during the time of what the agency determined to be the watershed event on May 19, 2000, when there was a violent takeover of Parliament. Since she filed more than a year after her entry on August 27, 1998, for her application to be considered, she must qualify for an exception outlined in INA 208A2D. The exception Ms. Rishika was seeking was of chained circumstances that materially affect her eligibility for asylum. In this case, there's no dispute that we have a change in circumstances, particularly the coup in May of 2000. The agency held that the chained conditions did not excuse Ms. Rishika's late application, because she did not apply after but four days before the May 19, 2000 takeover of government. By doing so, the agency read into INA 208A2D a requirement that does not exist in the plain language of the statute, a requirement that the agency should not apply after but four days before the May 19, 2000 takeover of government. In this case, Ms. Rishika's application was pending during the time of her entry on August 27, 1998, when there was a violent takeover of Parliament. Since she filed more than a year after her entry on August 27, 1998, for her application to be considered, she must qualify for an H.C.F.R. 204.4A for two little i's. And that one says that a late application has to be filed within a reasonable period of time following changed circumstances. How does that fit? Well, I think it's important to look at the fact that Ms. Rishika applied.  The regulation doesn't require that the agency or the applicant pinpoint when the change occurs. Her application was pending, so she applies. There's the May 19 takeover four days later. It's an unusual circumstance. But what does that mean, following the changed circumstance? How do you give effect to that word? I think what they're referring to there is it's a there is in the regulation it states that an applicant could become aware of changes after, and that that would affect the reasonable period. But she was appearing before an asylum officer a month after the May 19 event, so around June 20, 2009. I believe. Her application was pending at the time, so for her application to be adjudicated correctly, it should be based on prevailing country conditions at the time. So if her there's no mechanism that exists in the statute at all for you to apply twice, like four days later I'm going to apply again. There's no mechanism to do that because her application is already pending. So let's just pretend that assume she didn't apply until two days after the coup. Yes. Is there any doubt that she would then just have her application processed in the ordinary course and she would say there's been this coup and that's been a problem? No, that's the thing. And her brother informed her that the situation was getting much worse and that she should apply. Actually, in the record, she signed her asylum application in 99, but she didn't file. She actually had ineffective assistance of someone who wasn't an attorney who didn't advise her as to the one-year requirement. But she was still considering whether she should go back or not. And when her brother, when she spoke with her brother, he said very clearly, you know, he told her, look, things are getting worse, you should apply. And she did. Let me ask you a question. If we were to revand, there's been another coup, has there not, in 2006? Yes. In 2009, I believe. Well, 6 and 9, I believe. And 9, yes. Would the immigration judge then take those coups into consideration? Well, we believe that the petitioner has demonstrated enough individualized risk factors that this court could actually determine the grant. But, yes, if we had a reopen, then the immigration judge would be required to, I think, consider both of those things in making the determination. Because you said you considered the conditions at the time of the hearing and there have been two coups since then. Yes. All right. Yes, Your Honor. So let's, on her particular conditions, we have this fluid situation that's been in Fiji for a number of years, and then we have the information about women being at particular risk. Yes. But we also have cases that say you can't just have a generalized population. In other words, she can't say, well, I'm a woman, I fit in there, and therefore I'm going to have a problem. Yes. So is there any evidence other than she says, well, I'm a single woman, and that puts me in a different spot? We're not saying, we're not contending that as a single, even as a single Indo-Fijian woman, that all single Indo-Fijian women should be granted asylum. What we're saying here is that she is a single Indo-Fijian woman with, so she's a member of a disfavored group, as an Indo-Fijian, and the State Department reports amnesty have also shown that as a woman, she has a greater than 10 percent chance of abuse. Her individualized factor is the fact that she has no remaining ties in Fiji, and that really raises her fear much more. She's already suffered past harm when she had family there. Now all of her relatives have either moved away, her one remaining brother who was there, who informed her of the situation, he died in 2001. So I was having some trouble, I don't see that the past harm has any link to her having no family there. Or are you now saying this is a new game, so to speak? Well, it's not a new game in terms of the record, but yes, I mean, she has no ties to Fiji, and as a single woman of Indo-Fijian descent, with no network of support, there's, I think, a much greater risk that she will be persecuted. And most importantly, the immigration judge himself states that, and I'll quote, the respondent clearly suffered mistreatment in the past of a nature that no woman should suffer, and suffered ethnic and racial harassment, which no individual should have to suffer as well. Combined with those other risk factors, when the BIA made their decision, they just referred a sale, which is a Chinese woman, a Christian Chinese woman in Indonesia, and says that Ms. Reshika didn't demonstrate harm as great, which there's nothing in the record to support that. And he states nothing, the agency states nothing in the record that really undercuts Ms. Reshika's claim. It's all conjecture. I'd like to reserve the remaining time for rebuttal, if that's fine. Okay. Good morning, Your Honors. May it please the Court, my name is Cori Farrell, and I'm here today on behalf of the Attorney General. In this immigration case, Ms. Reshika did experience incidents of harassment and discrimination in Fiji. However, she waited almost two years after her arrival in the United States to file her asylum application, and the agency reasonably found that this untimeliness was not excused. Additionally, even if her untimely application had been excused, the agency looked at the merits of her case and found that she did not establish past persecution or a well-founded fear of future persecution based on individualized risk. How would you distinguish this case from Sayle v. Ashcroft? In Sayle, the petitioner in that case experienced repeated threats. Her property was destroyed, she actually fled mobs attempting to attack her, so it shows that there were more threats and violence that she experienced before she left here. The petitioner did testify that she experienced people called her names, they threw stones at her family's house, but it appears that the most serious incident she suffered in Fiji was in 1994 when a man walked up to her and grabbed her hand and she was frightened and yelled for the police and he let go. She testified that similar incidents happened until the time she left, but there are no specifics and we don't know exactly when they occurred. And that was in 1994, four years before she actually left Fiji. Thank you. In a way, it seems from listening to Ms. Rashika's counsel that this case telescopes into an issue about being a single Indo-Fijian woman. And I was rereading again, I keep rereading what the I.J. had to say about that. If the I.J. says there's not quite such a group or it hasn't been established as being a target, what would she have to do to meet her burden? I mean, she's given credible testimony, correct? That's correct. So where does that leave us? Because she is a member of a disfavored group. She does have to show lesser fear of future persecution to be granted asylum or withholding of removal. But here she's just kind of shown the general violence that all Indo-Fijian women suffer. And she hasn't pointed to any specific evidence in the record to show that women without family or women without support in Fiji are particularly targeted or suffer more incidents of violence than the Indo-Fijian population as a whole. And if I could go to the one-year bar issue real quick. I just wanted to state that even if, as you posed, she had filed her asylum application two days after the coup occurred, I believe the immigration judge explained that it wasn't just that the coup happened after her asylum application, but nothing had changed in Fiji that she feared. When asked why she was filing for asylum, she testified to incidents that happened when she was living in Fiji, that there was nothing that gave rise to a new fear. So it's the coup happening after the application taken together with her testimony about why she was filing for asylum. So that leaves me a little bit confused about the basis for saying that there's a one-year bar, which the board agrees with. That's correct. So, I mean, counsel portrays it as basically saying because it wasn't timed correctly, in other words, it happened after she filed her application, therefore, that she doesn't meet one of the two exceptions. You're now saying, well, that's not the reason. So now I'm wondering if we know the reason. And on page 43 of the record, it's page 6 of the immigration judge's decision, he also stated, and I quote, I do not find the respondent's testimony to adequately demonstrate that something specific happened that would have raised her fear substantially from the time prior to May 2000, so that she just demonstrated an excuse to the filing deadline. So it's looking at all of the facts of this case and not just necessarily the strict deadline of the day she filed and the day the coup occurred, but looking at everything taken together. Okay. And if we, so I don't know how that would come out, but if we disagreed on that and said, well, there isn't really a one-year bar, then the IJ and the BIA went on to look at the merits. Made an alternative merits finding. And on that, as I stated, there's no specific evidence in the record that endophagian women without family suffer a greater incidence of harm, and therefore she didn't meet her burden of establishing a well-founded fear of future persecution. If there are no further questions. Thank you. Thank you very much. Just a few points that I wanted to address. One, I think the government mischaracterized her, the situation where she had her hand grabbed by the individual. She faced repeated sexual harassment, various things over the years. But in that incident, she tried to pull away from the man. She called for help. Nothing happened. Finally, when she was able to get away, she got to the police, and then they laughed at her and said that, as an endophagian, you should expect this. So that's, I think, a mischaracterization. Secondly, saying that there's no evidence in the record to support the claim that the government, it was on the burden of the BIA and the immigration judge to cite something when her testimony was credible, to cite something to show that, to undercut her claim. And I think there's, I mean, the record is huge in showing various things, including problems that women face in terms of abuse, as well as problems women face in terms of employment and things like that. I can pull stuff from the record by the end of the day. Assuming that were true, then you're not suggesting that all single endophagian women should be given asylum automatically. No, I'm not suggesting that, Your Honor. What I'm suggesting is if you have no network of support to help protect you, to help provide for you, how is she going to not suffer persecution? If there's no chance of her being employed, if there's no chance of, if there's a much higher risk that she has no protection there, the police is unwilling to protect her, and she has no family to assist her, how is it that she will, that's the individualized risk factor. I also wanted to point to Sale. The worst scenario in Sale was that a mob surrounded this woman's car, and that was the fear that she demonstrated. Here, she was actually grabbed by someone, and her sister's friend was raped. The police did nothing about it, even though it was, she was raped by an ethnic Fijian bus driver. The police did nothing to, about that rape, and her sister's friend was arrested. Her sister's friend committed suicide. Actually, the record indicates that Fiji's got the highest suicide rate of women in the world. So, I mean, she's a member of a disfavored group as an Indo-Fijian, but additionally has a much greater chance as a woman as well. Thank you. Thank you. It's great to thank both of you for your argument this morning. The case argued, Reshika v. Holder is submitted, but of course we have the remaining issue of the 20 days, so we'll have you wait here for your advice to the clerk's office. Thank both of you.
judges: Nelson D. W., Thompson, McKeown